Jennine DiSomma, Esq. (jdisomma@saiber.com)
Jakob B. Halpern, Esq. (jhalpern@saiber.com)
Vincent C. Cirilli, Esq. (vcirilli@saiber.com)
**SAIBER LLC**
18 Columbia Turnpike, Suite 200
Florham Park, New Jersey 07932-2266
(973) 622-3333
*Attorneys for Defendants*
*Central Garden & Pet Co., Geisi Custode,*
*Erin Sloan, and Mary Wuestenberg*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LOURDES GONZALEZ,<br><br>Plaintiff,<br><br>v.<br><br>CENTRAL GARDEN & PET CO., GEISI CUSTODE, ERIN SLOAN, MARY WUESTENBERG, ABC COMPANIES 1-5 (fictitious names describing presently unidentified business entities), and JOHN DOES 1-5 (fictitious names describing presently unidentified individuals),<br><br>Defendants. | Civil Action No. 23-2996<br><br>**NOTICE OF REMOVAL**<br><br>***Document Filed Electronically***<br><br>[On Removal from the Superior Court of New Jersey, Law Division, Burlington County, Docket No. BUR-L-717-23] |

**TO:** United States District Court for the District of New Jersey
Mitchell H. Cohen Building & U.S. Courthouse
4th & Cooper Streets
Camden, NJ 08101

-and-

Matthew A. Luber, Esq. (mal@njlegal.com)
Charles J. Kocher, Esq. (cjk@njlegal.com)
**MCOMBER & MCOMBER, P.C.**
39 East Main Street
Marlton, New Jersey 08053
*Attorneys for Plaintiff*
*Lourdes Gonzalez*

**PLEASE TAKE NOTICE THAT**, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, Defendants, Central Garden & Pet Co. ("Central"), Geisi Custode ("Custode"), Erin Sloan ("Sloan"), and Mary Wuestenberg ("Wuestenberg") (collectively "Defendants"), by and through their attorneys, Saiber LLC, file this Notice of Removal of the above-captioned action from the Superior Court of New Jersey, Law Division, Burlington County, and respectfully state the following as the basis for removal to this Court:

## I. PROCEDURAL HISTORY AND PLAINTIFF'S ALLEGATIONS

1. On April 10, 2023, Plaintiff, Lourdes Gonzalez ("Plaintiff"), filed a Complaint in the Superior Court of New Jersey, Law Division, Burlington County, docket no. BUR-L-717-23. A copy of the Complaint is attached hereto as **Exhibit A**, which, pursuant to 28 U.S.C. § 1446(a), constitutes all "process, pleadings, and orders served upon" Defendants in this action.

2. Plaintiff's five-count Complaint purports to allege the following claims: (1) retaliation in violation of the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1, *et seq.*; (2) wrongful discharge in violation of public policy; (3) hostile work environment based on sexual harassment and gender/sex discrimination in violation of the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1, *et seq.*; (4) hostile work environment, discrimination, and disparate treatment based on race in violation of the LAD; and (5) retaliation in violation of the LAD.

3. Custode was served with four sets of the Summons and Complaint on May 2, 2023.[1]

[1] Although Defendants dispute that proper service of process has been effectuated on all parties by Plaintiff in this matter, all Defendants have agreed to accept service and join in this removal application.

## II. BASIS FOR FEDERAL COURT JURISDICTION: DIVERSITY

4. Plaintiff is a citizen of New Jersey. Ex. A ¶ 2.

5. Central is a corporation incorporated under the laws of Delaware with its principal place of business in California. See id. ¶ 3. Accordingly, Central is a citizen of both Delaware and California.

6. Sloan is a citizen of Illinois. Id. ¶ 5.

7. Although the Complaint alleges that Wuestenberg is also a citizen of Illinois, id. ¶ 6, she is, in fact, a citizen of Wisconsin.

8. Custode is a citizen of New Jersey. Id. ¶ 4. As explained more fully below, Custode has been fraudulently named as a party solely for the purpose of defeating diversity jurisdiction. Thus, her inclusion as a defendant does not destroy diversity jurisdiction as a matter of law.

9. Plaintiff's joinder of Custode as a defendant is fraudulent as a matter of law because Plaintiff's Complaint does not include -- nor can it include -- any factual allegations against Custode that would support a finding of individual liability with respect to any of the five counts in the Complaint. See In re Briscoe, 448 F.3d 201, 216 (3d Cir. 2006) (joinder is fraudulent if "there is no reasonable basis in fact or colorable ground supporting the claim against the joined defendant"); McKenna v. Verint Ams. Inc., 2022 U.S. Dist. LEXIS 141359, at *14, *19 (D.N.J. Aug. 9, 2022) (finding fraudulent joinder and explaining "individual liability requires personal involvement of each individual defendant, and thus CEPA, will not impose liability on any employee . . . unless the plaintiff [alleges] that the [individual] defendant took [some] adverse action against [her] because of [her] whistleblowing" (internal quotation marks omitted)); Mahmoud v. Canon Sols. Am., Inc., 2021 U.S. Dist. LEXIS 247473, at *8-10 (D.N.J.

Dec. 22, 2021) (finding fraudulent joinder and explaining that there is no individual liability under the LAD unless it is established that the individual defendant aided and abetted an LAD violation).

10. Plaintiff does not allege that Custode exercised any supervisory control over Plaintiff and had the authority to take any adverse action against Plaintiff. The Complaint does not contain allegations that it was Custode who terminated Plaintiff, took any adverse employment action against Plaintiff, or otherwise retaliated against Plaintiff for engaging in purported protected activity to support her CEPA and LAD retaliation claims. Moreover, Plaintiff does not allege that Custode discriminated against or harassed Plaintiff in support of her LAD discrimination and hostile work environment claims. Nor are there any allegations that Custode "aided and abetted" a violation of the LAD. Rather, all of Plaintiff's allegations with respect to adverse actions have been pled either against "Defendants" generally or Central, with no allegations specific to any of the individual defendants, including Custode. See Ex. A ¶¶ 20-21, 36, 60-61, 64-71, 95-96, 110-111.

11. Even if re-pled, Plaintiff's complaint could not allege a sufficient factual basis for individual liability against Custode.

12. Custode did not supervise Plaintiff and had no authority to hire, fire, or discipline her. Plaintiff was not in Custode's chain of command, and Custode was not responsible for managing Plaintiff nor anyone else in Central's human resources department. **Exhibit B**, Declaration of Geisi Custode ¶¶ 3-4.[2]

[2] Although fraudulent joinder may be found on the face of Plaintiff's Complaint, the Court is permitted to look beyond the pleadings to determine whether a finding of fraudulent joinder is appropriate. See In re Briscoe, 448 F.3d at 219 ("[A] court can look to more than just the pleading allegations to identify indicia of fraudulent joinder.").

13. In addition, Custode was not consulted on the decision to terminate Plaintiff's employment, did not make the decision to terminate Plaintiff, and had no authority to make the decision to terminate Plaintiff. Id. ¶¶ 7-8.

14. Given that Custode had no authority to take any adverse action against Plaintiff, and that Plaintiff did not and cannot allege that Custode actually took any adverse action against Plaintiff, there is no reasonable basis in fact or colorable ground supporting the claims against Custode. Therefore, Custode has been fraudulently joined as a defendant in this matter to defeat diversity jurisdiction.

15. Accordingly, after disregarding the citizenship of fraudulently joined defendant Custode, there is complete diversity among the parties because Plaintiff is a citizen of New Jersey, defendant Central is a citizen of Delaware and California, defendant Sloan is a citizen of Illinois, and defendant Wuestenberg is a citizen of Wisconsin.

16. In the Complaint, Plaintiff seeks various forms of injunctive relief, compensatory damages (including back pay and front pay), punitive damages, attorneys' fees, costs, pre-judgment interest, post-judgment interest, and all other relief the court deems equitable and just. Ex. A, Wherefore Clauses.

17. The amount in controversy, therefore, exceeds $75,000, exclusive of costs and interest. See Sussman v. Capital One, N.A., 2014 U.S. Dist. LEXIS 151866, at *7-10 (D.N.J. Oct. 24, 2014) (explaining that to avoid remand, a plaintiff must establish with "legal certainty" that he or she cannot recover the jurisdictional minimum).

18. Accordingly, removal of this action is appropriate pursuant to 28 U.S.C. §§ 1332 and 1441 because the parties are completely diverse and the amount in controversy exceeds $75,000.

## III. DEFENDANTS HAVE SATISFIED THE PROCEDURAL REQUIREMENTS FOR REMOVAL

19. This Notice of Removal is being timely filed pursuant to 28 U.S.C. § 1446(b) because it has been filed within thirty days of May 2, 2023, the earliest date of proper service of the Complaint on any defendant.

20. Pursuant to 28 U.S.C. § 1441(a), venue is proper in the United States District Court for the District of New Jersey, Camden Vicinage, because it is the "district and division embracing the place where such action is pending."

21. Pursuant to 28 U.S.C. § 1446(b)(2)(A), all Defendants have consented to removal.

22. In accordance with 28 U.S.C. § 1446(d), Defendants will file a Notice of this Notice of Removal with the Clerk of the Superior Court of New Jersey, Law Division, Burlington County, and will serve a copy of same on Plaintiff.

23. No previous application has been made for the relief requested herein.

24. If any question arises as to the propriety of the removal of this action, Defendants respectfully request the opportunity to brief any disputed issues and to present oral argument in support of their position that this case is properly removable.

25. Nothing in this Notice of Removal shall be interpreted as a waiver or relinquishment of Defendants' rights to assert any procedural or substantive defense.

26. By removing this action, Defendants do not admit to any of the allegations in Plaintiff's Complaint.

**WHEREFORE**, Defendants hereby seek to remove the state court action, Superior Court of New Jersey, Law Division, Burlington County, docket no. BUR-L-717-23, to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

Respectfully submitted,

**SAIBER LLC**
*Attorneys for Defendants*
*Central Garden & Pet Co., Geisi Custode,*
*Erin Sloan, and Mary Wuestenberg*

By: *s/ Jennine DiSomma*
JENNINE DiSOMMA

Dated: June 1, 2023

**CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2**

On behalf of Defendants, I certify that, to the best of my knowledge, the matter in controversy is not the subject of any other action pending in any court, other than the matter in the Superior Court of New Jersey, Law Division, Burlington County, docket no. BUR-L-717-23, from which Defendants seek removal, or of any pending arbitration or administrative proceeding.

*s/ Jennine DiSomma*
JENNINE DiSOMMA

Dated: June 1, 2023

**CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 201.1**

Under Local Civil Rule 201.1, Defendants, by their undersigned counsel, hereby certify that, upon information and belief, Plaintiff seeks both injunctive relief and monetary relief greater than $150,000, and, therefore, this action is not appropriate for compulsory arbitration.

*s/ Jennine DiSomma*
JENNINE DiSOMMA

Dated: June 1, 2023

**CERTIFICATION OF SERVICE**

I hereby certify that, on this date, a true and correct copy of the foregoing Notice of Removal (with exhibits) was served upon the following via Email and Federal Express delivery:

Matthew A. Luber, Esq. (mal@njlegal.com)
Charles J. Kocher, Esq. (cjk@njlegal.com)
**MCOMBER & MCOMBER, P.C.**
39 East Main Street
Marlton, New Jersey 08053
*Attorneys for Plaintiff*
*Lourdes Gonzalez*

*s/ Jennine DiSomma*
JENNINE DiSOMMA

Dated: June 1, 2023

# EXHIBIT A

Matthew A. Luber, Esq. - NJ ID # 017302010
mal@njlegal.com
Charles J. Kocher, Esq. – NJ ID # 016952004
cjk@njlegal.com
McOMBER, McOMBER, & LUBER, P.C.
39 East Main Street
Marlton, New Jersey 08053
(856) 985-9800
(732) 530-8545 Fax
*Attorneys for Plaintiff Lourdes Gonzalez*

| | |
|---|---|
| LOURDES GONZALEZ<br><br>Plaintiff,<br>vs.<br><br>CENTRAL GARDEN & PET CO., GELSI CUSTODE, ERIN SLOAN, MARY WUESTENBERG, ABC COMPANIES 1-5 (fictitious names describing presently unidentified business entities), and JOHN DOES 1-5 (fictitious names describing presently unidentified individuals),<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION<br>BURLINGTON COUNTY<br><br>DOCKET NO.:<br><br><u>Civil Action</u><br><br>**COMPLAINT & DEMAND FOR TRIAL BY JURY** |

Plaintiff Lourdes Gonzalez ("Plaintiff"), by way of filing her Complaint against Defendant Central Garden & Pet Co. ("Defendant Central Garden & Pet" or "Corporate Defendant"), Defendant Gelsi Custode ("Defendant Custode"), Defendant Erin Sloan ("Defendant Sloan"), and Defendant Mary Wuestenberg ("Defendant Wuestenberg") (collectively "Defendants"), alleges as follows:

## <u>INTRODUCTION</u>

1. Plaintiff, an experienced Human Resources Manager, was hopeful and excited to begin her new career at Defendant Central Pet & Garden. Plaintiff takes her responsibilities as a Human Resource Manager very seriously and made an immediate impact at Defendant Central Pet & Garden. That all changed, however, when Plaintiff reported fraud, wage theft, and

discrimination in the workplace. Shortly after Plaintiff made several good faith internal complaints of unlawful conduct and discrimination, she was swiftly suspended and ultimately terminated. Fortunately, New Jersey law provides redress for such blatant retaliation. Plaintiff, accordingly, brings this lawsuit.

**PARTIES**

2. Plaintiff is a woman residing at 19 Brookside Drive, Bordentown, New Jersey 08505. At all times relevant hereto, Plaintiff was employed by Defendant Central Garden & Pet as a Senior Human Resources Manager. Plaintiff worked in Defendant Central Garden & Pet's Distribution facilities located at 401A Cabot Drive, Hamilton New Jersey, 08691.

3. Defendant Central Garden & Pet is a California corporation headquartered at 1340 Treat Blvd Suite 600 Walnut Creek, California, 94597 United States. At all times relevant hereto, Defendant Central Garden & Pet is an "employer" as defined under the Conscientious Employee Protection Act, *N.J.S.A.* 34:19-1, *et seq.* ("CEPA").

4. Defendant Custode is a citizen of New Jersey and, at all times relevant hereto, is an individual employed by Defendant Central Garden & Pet as Operations Manager. This claim is brought against Defendant Custode in her individual capacity and/or as an agent of Defendant Central Garden & Pet.

5. Defendant Sloan is a citizen of Illinois and, at all times relevant hereto, is an individual employed by Defendant Central Garden & Pet as Director of Human Resources. This claim is brought against Defendant Sloan in her individual capacity and/or as an agent of Defendant Central Garden & Pet. At all times relevant hereto, Defendant Sloan is an "employer" as defined under the CEPA.

6. Defendant Wuestenberg is a citizen of Illinois and, at all times relevant hereto, is an individual employed by Defendant Central Garden & Pet as a Director of Human Resources. This claim is brought against Defendant Wuestenberg in her individual capacity and/or as an agent of Defendant Central Garden & Pet. At all times relevant hereto, Defendant Wuestenberg is an "employer" as defined under the CEPA.

7. At all relevant times, Defendants have been single and joint employers of Plaintiff and others similarly situated within the meaning of New Jersey State Law. In this regard, their operations are interrelated and unified, and they share common management, centralized control of labor relations, common ownership, common control, common website, common business purposes, and interrelated business goals. In addition, they jointly determine and manage the pay practices, rates of employee pay and method of payment, maintenance of employee records and personnel policies, practices, and decisions with respect to the employees.

8. Defendants ABC Corporations 1 through 5 are currently unidentified business entities who have acted in concert with Corporate Defendants, and/or currently unidentified business entities responsible for the creation and/or implementation of harassment or anti-retaliation policies of Defendant Central Garden & Pet, and/or currently unidentified business entities who have liability for the damages suffered by Plaintiff under any theory advanced therein.

9. Defendants John Does 1 through 5 are currently unidentified individuals who acted in concert with Defendants and/or currently unidentified individuals responsible for the creation and/or implementation of harassment or anti-retaliation policies of Defendant Central Garden & Pet and are currently unidentified individuals who may have liability for the damages suffered by Plaintiff under any theory advanced herein.

## FACTS COMMON TO ALL COUNTS

10. Plaintiff repeats each and every allegation set forth above as if set forth fully herein at length.

11. Defendant Central Garden & Pet is "a market leader" in the Garden and Pet industries. For over 40 years, Central has proudly nurtured happy and healthy homes by bringing innovative and trusted solutions to its consumers and customers."[1]

12. Defendant Central Garden & Pet has over 7,000 employees and reported $3.3 billion in revenues in the fiscal year of 2022.[2]

13. On January 11, 2021, Plaintiff commenced employment with Corporate Defendants as a Senior Human Resources Manager at Defendant Central Garden & Pet's Distribution facilities in Hamilton, New Jersey.

14. As a Senior Human Resources Manager, Plaintiff was responsible duties, including but not limited to, developing and implementing HR strategies, managing employee relations, and providing guidance and support to managers on HR-related matters.

15. At all times relevant hereto, Plaintiff dedicated herself to completing her job responsibilities. Plaintiff was an experienced Human Resources Manager who took great pride in her work at Defendant Central Garden & Pet.

16. From the onset of Plaintiff's employment and all times relevant hereto, Plaintiff noticed severe misconduct occurring within Defendant Central Garden & Pet.

17. For example, but not limitation, Plaintiff discovered and reported fraud and wage theft occurring within Defendant Central Garden & Pet.

---

[1] https://www.central.com/

[2] https://ir.central.com/news-events/press-releases/detail/368/central-garden-pet-announces-q4-and-fiscal-2022-financial

18. In February 2021, Plaintiff discovered Defendant Central Garden & Pet Operations Manager, Jay Gonzalez, and his father, Warehouse Associate, Noel Gonzalez, were engaged in fraud and blatant wage theft.

**Lourdes Gonzalez**

| | |
|---|---|
| **From:** | Lourdes Gonzalez |
| **Sent:** | Friday, February 26, 2021 6:31 PM |
| **To:** | Mary Wuestenberg; Benjamin Major; Keith Bornholtz |
| **Subject:** | RE: Employment of Family Members |
| **Attachments:** | Copy of Central Garden and Pet Supply Hamilton New Jersey.xlsx; Lourdes Gonzalez Statement - JG Investigation.pdf; Ed Kazmierski Statement - JG Investigation.pdf; Approved Invoices - JG Investigation.pdf; Pay Rate Increase Emails - JG Investigation.pdf |
| **Importance:** | High |

Good Evening, here are the findings of the investigation for Jay Gonzalez.

Attached you will find:
Spreadsheet with all payments made to Noel Gonzalez at the incorrect rate and the rate he should have been paid (discrepancy of 24,525.27)
Statements from Ed and I (including emails sent to Jay)
Invoices approved by Jay Gonzalez with unapproved inflated rates.
Emails from Jay Gonzalez to Coworx authorizing the incorrect inflated rates for Noel Gonzalez

After learning the approval process for invoices and researching hours paid to Noel, I believe that Jay acted alone. All hours reported and certified were in line with the hours that Noel works. The only discrepancies found was the rate. Jay and only Jay received, reviewed, and approved the invoices.

If there are any questions or if you require additional information please feel free to reach out to me.

**Lourdes I. Gonzalez**
**Senior Human Resources Manager**
lgonzalez@centralpet.com
401A Cabot Drive, Hamilton NJ, 08691
O 609-438-3425 M 609-358-3394 CENTRAL.COM

CENTRAL HUMAN RESOURCES

19. Plaintiff thoroughly investigated the wage theft and on February 26, 2021, Plaintiff complained about Defendants conduct, reporting over $24,000 of fraud/wage theft to Corporate Defendants. For example:

CENTRAL PET DISTRIBUTION

DATE: February 3, 2021

FOR: Legal

RE: Statement of Findings for Jay Gonzalez Investigation

On February 16, 2021, I as the new SR. HR Manager for Hamilton Central Pet, was trying to figure out Dayforce (our HRIS System) and how to input and print reports for employees and temps. I was trying to see how many hours each shift was working and making comparisons to work on employee morale. I could not successfully figure out how to complete so I asked Bill McCabe, since he enters temps into Dayforce, for help. We could not figure out how to run the report I was looking for correctly. I asked him to bring up the temp Noel Gonzalez to see if I can see it that way. At that time, the only temp name I was aware of was Noel Gonzalez, because he was Jay Gonzalez's father. When he entered in the name no information was generated. I asked Bill shouldn't Noel be in Dayforce. Bill stated that he should and then he stated, "oh Jay asked me not to add him into Dayforce". I thought that was strange, so I emailed Jay. After Jay replied to my email, he came to speak to me in person. He reiterated that his father was not computer savvy and CoWorx made their employees do additional work by punching in on their personal system thru the mobile device and then the temps punched in thru Dayforce. I stated that if Noel had to punch in one system why would it be Coworx if our Dayforce report of hours would supersede anything Coworx had since Managers certified Dayforce hours. At this point Jay said he doesn't know but if I wanted him added he would add him. I said that he had to use Dayforce just like everyone else and that Jay should look at the optics of how it looks when his dad is doing something differently. On February 22, 2021, I again checked the system to follow up to see if Noel was enrolled. After checking the system, I noticed Noel still was not being generated in the system. I again emailed Jay and asked him, he said he asked Bill to generate a badge number and once that was done, he would enroll him. On February 23, 2021 I saw Noel in the system, but I did not see him punching in our out and I noticed that on February 24, 2021 again he had no punches. At this point I saw all his pushback as a red flag, so I called Mary Wuestenberg and notified her of my concerns. Mary advised me to reach out to Lise Mattel which I did but I felt that what I really needed was the invoices. I knew from prior conversations with Jay that only Jay saw and approved the invoices. When I first started, I told him that I could help with the invoices and he said no, that he needed to do it because of numbers he needed to add to the P&L. I offered to give him those numbers and he still said no that only he could receive invoices. I tried to find the Accounts Payable in CGP that oversaw our location and remembered that I was in an email due to a new staffing agency that we were setting up. When I searched my inbox for any Accounts Payable emails, I noticed that Jay had sent me, I believe erroneously Coworx invoices. When I reviewed the invoices, I saw a discrepancy, in the rate of pay for his father, Noel Gonzalez. Noel as a Warehouse Associate Level 1 employee should be making 13.00/hr yet the invoice showed he was making $30.00/hr (42.12 amount included markup). Noel's hours were all reported correctly. I requested all invoice from Accounts Payable and saw that Jay started Noel at 20.00/hr. On 09/27/20 the invoices showed that his rate was changed to 25.00/hr. Finally, on 11/22/20 we saw another increase on the invoices to 30.00/hr. During the investigation I have questioned Benjamin Major, Mike Meier and Ed Kazmierski to see if anyone approved for Jay to pay Noel at such an inflated rate and they have all have said no. Ed stated he approved Jay to hire Noel Gonzalez even though he was his father. Jay has overpaid Noel Gonzalez and the Coworx agency an excess of $24,525.27.

Lourdes Gonzalez, Sr. Human Resources Manager

20. Inexplicably, after Plaintiff's complaint of fraud/wage theft occurring within Defendant Central Garden & Pet, Plaintiff began facing gender discrimination and retaliation at the hands of Defendants.

21. For example, but not limitation, on April 22, 2021, Plaintiff realized Defendant Central Garden & Pet removed Plaintiff from the weekly Operations and Staffing Meetings. On May 3, 2021, Plaintiff complained to Defendants about the removal.

22. Herman Gonzalez, Defendant's Operations Manager, justified the basis for her removal as, "operations need Ed [Director of Operations] or I to be the filter between the operations and HR."

23. However, Defendants purported rationale is a clear pretext. Defendant Central Garden & Pet's Transportation Manager and Experience Manager were still included in the meetings without the purported "filter."

24. To make matters worse, Defendant Central Garden & Pet's Day Shift Manager, Eben Purcell informed Plaintiff that during the meeting, Herman Gonzalez informed the attendees, now exclusively male, that Plaintiff "would not be attending so we can speak like men."

25. Later that day, when Plaintiff reported to Herman Gonzalez that Operations personnel were not responding to her emails. Herman Gonzalez responded by informing Plaintiff she was being "too emotional," which is a sexist stereotype given by males to female employees.

26. The next day, Plaintiff reported the gender discrimination she was facing to Defendant Sloan.

27. Despite facing direct retaliation for reporting the illegal conduct, discrimination, fraud, and wage theft occurring at Defendant Central Garden & Pet, Plaintiff continued to report Defendants' illegal conduct.

28. For example, but not limitation, On August 25, 2022, the Plaintiff reported her belief that Jose Arana, Night Shift Manager, was violating N.J.S.A § 34:11D-2, therefore rendering Defendants noncompliant with the regulation.

29. For example, but not limitation, on September 10, 2021, Plaintiff conducted a routine exit interview with a Defendant Central Garden & Pet Customer Experience Associate.

30. During her exit interview, Defendant Central Garden & Pet Customer Experience Associate, Cocoa Bracket, an African American employee, reported discrimination as a factor contributing to her decision to quit her role with Defendant Central Garden & Pet.

31. Specifically, Ms. Bracket reported to Plaintiff, "communication I received were different from communication with my team. He allowed racially charging incidents to occur…There has been incidents in which he has stereotyped me and was unprofessional."

32. After conducting the exit interview, Plaintiff immediately reported the complaints of discrimination to Defendant Sloan. Plaintiff sent Defendant Sloan the exit interview paperwork and reported that Ms. Bracket's responses allege racial discrimination by Defendants, deeply concerning Plaintiff.

| | |
|---|---|
| **From:** | Lourdes Gonzalez |
| **Sent:** | Friday, September 10, 2021 1:40 PM |
| **To:** | Erin Sloan |
| **Subject:** | RE: MY CENTRAL PET FILE |
| **Attachments:** | 20210910135145069.pdf |

Hi Erin, see attached Cocoa's exit interview. Some of the answers were concerning.

**Lourdes I. Gonzalez**
**Senior Human Resources Manager**
lgonzalez@centralpet.com
401A Cabot Drive, Hamilton NJ, 08691
O 609-438-3425 M 609-358-3394 **CENTRAL.COM**

CENTRAL HUMAN RESOURCES

**From:** Lourdes Gonzalez
**Sent:** Tuesday, September 7, 2021 10:00 AM
**To:** Erin Sloan <esloan@central.com>
**Subject:** RE: MY CENTRAL PET FILE

There has been issues before. Remember that remark that they made that she felt she was being stereotyped. She has also made comments that she feels that she has been treated unfairly. I'll know more during our exit interview.

**Lourdes I. Gonzalez**
**Senior Human Resources Manager**
lgonzalez@centralpet.com
401A Cabot Drive, Hamilton NJ, 08691
O 609-438-3425 M 609-358-3394 **CENTRAL.COM**

CENTRAL HUMAN RESOURCES

**From:** Erin Sloan <esloan@central.com>
**Sent:** Tuesday, September 7, 2021 9:57 AM
**To:** Lourdes Gonzalez <lgonzalez@centralpet.com>
**Subject:** Re: MY CENTRAL PET FILE

We allow for a supervised review and if someone asks for copies we've done that before. I thought she was leaving on good terms?

Erin Sloan, SPHR, SHRM-SCP
Director of Human Resources
847-804-9045 (c)

33. Defendant Sloan did not respond to Plaintiff's complaints of unlawful discrimination occurring at Defendants.

34. When Plaintiff followed up with Defendant Sloan regarding the status of the investigation into Plaintiff's complaint of racial discrimination, Defendant Sloan informed Plaintiff that Defendants were "still investigating." However, upon information and belief, Defendants never actually investigated Plaintiff's complaint.

35. Thereafter, Defendant Central Garden & Pet subjected Plaintiff to further adverse employment action in direct retaliation for her complaints.

36. On January 4, 2022, Defendant Central Garden & Pet issued Plaintiff a negative yearly performance review in direct retaliation for her complaints.

37. Plaintiff had achieved measurable and quantifiable success for the year. Defendants attempted use the performance review as a pretext to cover their retaliation against Plaintiff.

38. In fact, a few weeks later, on January 31, 2022, Defendant Central Garden & Pet assigned Plaintiff to manage the Human Resources at an additional Distribution facility in Fairfield, Ohio (further exemplifying Plaintiff's success and the retaliatory and pretextual nature of Defendants' conduct).

39. Despite facing continuous retaliation for lodging her complaints of unlawful conduct occurring within Defendants, Plaintiff was committed to continue reporting the unlawful conduct.

40. For example, but not limitation, on August 25, 2022, Plaintiff reported violations of the New Jersey Sick Leave Act to Defendants. Defendants did not respond to Plaintiff's complaint.

**Lourdes Gonzalez**

| | |
|---|---|
| **From:** | Lourdes Gonzalez |
| **Sent:** | Thursday, August 25, 2022 12:19 PM |
| **To:** | Geisi Custode; Benjamin Major |
| **Cc:** | Erin Sloan |
| **Subject:** | Jose Arana |
| **Importance:** | High |

Team, I wanted to bring a few concerns I have regarding working with Jose. I have been here for over a year now providing guidance, training, and necessary tools to ensure operations as well as I meet our goals. My goals are directly tied into Operations, so when I see that Operations is not meeting certain KPI's I see that as a failure on my end since we are all a team working on a goal. While we have seen much stabilization on Day Shift, when it comes to attrition, training, employee morale and culture overall, I have not seen any improvement on Night Shift.

As a team player I have no issues in rolling up my sleeves and going out to recruit, but when I see 4 new hires leave within 30 days it becomes frustrating. Attrition has been an issue since I was hired. I was able to help lower the percentage on the Day Shift but continue to struggle on the Night Shift. I have given Jose tools such as an onboarding checklist, a structured training program, and the 30/60/90 Introductory form. Additionally, I have also given him training on how to use all tools I have created and given him. Jose does not utilize any of the tools given. We continue to struggle with attrition, employee comments of not being properly trained, employees not being onboard correctly, and not given performance feedback while they are new to the company. As it has been explained to Jose these are all crucial steps in cultivating a culture employees want to work in.

More concerning is that recently I audited our timesheets to ensure we are in compliance with NJ Sick Leave Act, since we have a pending violation complaint. Complaints even if they are won open the doors to audits and I like to be proactive not reactive. I noticed that Jose has been manually entering all the sick time into Dayforce as opposed to having the employees request it. Sick Leave is protected leave, which means that employees must request it, and we must provide a trail of all requests for Sick Time. Employers are not allowed to pay sick leave, because an employee calls out, as it has been explained to Jose. I emailed Jose, as I normally do with concerns and Jose does not respond. His lack of communication with me has been a documented grievance I have made several times.

Geisi if you can please follow up with him to ensure he uses tools given and that he responds to my emails I would appreciate it.

**Lourdes I. Gonzalez**
**Senior Human Resources Manager**
lgonzalez@centralpet.com
401A Cabot Drive, Hamilton NJ, 08691
O 609-438-3425 M 609-358-3394 **CENTRAL.COM**

CENTRAL
HUMAN
RESOURCES

41. On October 27, 2022, Plaintiff uncovered further evidence of racial discrimination occurring at Defendants.

42. While Plaintiff was cleaning the Attendance Tracker Report, she realized Defendant Custode had not updated the tracker since May 2022. Therefore, Plaintiff ran an

Attendance Report, which uncovered severe attendance violations occurring at Defendant Central Pet & Garden that were untracked since May.

43. Plaintiff was shocked Defendant Custode had essentially stopped enforcing Defendants' attendance policies. Prior to May 2022, Defendant Custode stringently enforced the attendance polices via the Attendance Tracker.

44. Plaintiff was concerned that Defendant Custode utilized Defendants attendance policies to fire Defendant Central Pet & Garden's African American Associates from the day shift. Plaintiff believed that once Defendant Custode had rid the Hamilton facility of the African American Associates from the day shift, she intentionally stopped enforcing the attendance policies.

45. Plaintiff reasonably believed Defendant Custode's conduct constituted severe racial discrimination in violation of the New Jersey Law Against Discrimination.

46. Therefore, the very next day, on October 28, 2022, Plaintiff reported the conduct to her supervisor, Defendant Sloan via telephone call. Defendant Sloan responded by downplaying Plaintiff's complaints.

47. Furthermore, that same day, Defendant Custode reported to Defendants her belief that Defendant Custode refused to hire a referral for the Day Shift due to their race. Plaintiff believed such because when she inquired into the rationale for not hiring the referral, Defendant Custode stated, "you know why." Plaintiff reasonably believed Defendant Custode did not hire the referral because of their race.

48. Plaintiff could not continue to sit idly and let Defendants turn a blind eye to her substantiated beliefs that Defendants were engaged in blatant racial discrimination in violation of the New Jersey Law Against Discrimination.

49. Therefore, on November 2, 2022, after realizing that Defendants were not taking Plaintiff's complaints of discrimination seriously, Plaintiff initiated a formal complaint to Defendant Wuesternberg, Director of Human Resources. Plaintiff called Defendant Wuesternberg to discuss her concerns and formalized her complaint in a follow up email (attached in part).

**From:** Lourdes Gonzalez <lgonzalez@centralpet.com>
**Sent:** Wednesday, November 2, 2022 2:12 PM
**To:** Mary Wuestenberg <mwuestenberg@central.com>
**Subject:** Recap of Confidential Meeting

Hi Mary, thank you for taking the time to speak to me and listening to my concerns. As I mentioned I am spoke to you because I feel I have exhausted my resources, my direct supervisor Erin Sloan, and do not feel that she is correctly analyzing the concerns I have brought to her attention.

My first concern is the email that Mike Meir sent Erin and I and how he wanted me to manage employee concerns. Mike and I have had a rocky relationship which I have documented and spoke to Erin about. Once Mike was named Director for Hamilton, I quickly expressed my concerns to Erin. In the past he has told Ops team that they should not work with me nor include me with employee concerns, and I have heard him making statements to minimize my role to that of an Admin position. I believe Erin addressed concerns with Mike since his tone was a little different. When it came to the recent email, Mike sent, I disagreed with his views on how HR should function and requested to get on a call to be more aligned which he refused. Unfortunately, I did not receive Erin's support and she doubled down on his request that I should in fact work in the capacity he requested. I reminded her that for the most part I did but recently the complaints about Geisi, our operations Manager, have been more concerning and when I reach out to her, her responses have been unreasonable. I also advised her that while have always felt that she was an empathetic leader I was starting to notice that maybe there were discriminatory acts on her part.

1. When the Day Shift was mixed with African Americans and Hispanics Geisi would strictly apply all policies and would write up employees. In one instance she wanted to write up an African American employee, James Funches, because he worked to slow. I asked her if there were any metrics or KPI's and she said no. I told her that I wouldn't feel comfortable writing one employee up "because it looks like he works slowly". We then worked together to create metrics. Coincidently on the same day the metrics were introduced to the Team Leads, James's employment was terminated. After that she never ensured it was followed. I asked her a few times and she was dismissive. Aside from Stanley who is a long-term employee on a final, James was the last African American employee on Day shift and none have been hired since.
2. At one point around May, she declined to hired for Day Shift employee with experience who was African American, and I advised her I wish it would have worked out, because there seems to be no diversity on Day Shift after all the recent terminations and the perception that could cause. Geisi commented back well we have black people on Night Shift, we hire them on Night Shift. I told her yes but that doesn't resolve the perception on Day Shift. She was dismissive of the conversation, and I dropped it. We recently had a Day Shift referral and she refused to hire her which is not common and when I asked her why she said that I knew why, and I said no I don't, you need to be more specific like is it because attendance and Geisi responded with yes, it's because of attendance.
3. Since the population has become majority Hispanic, there are no longer any employees written up for attendance nor performance, even if there are performance mistakes. While I would agree that this is her call, I am concerned that when there were African Americans she would a minimum hold documented conversations and now that the team is mostly Hispanic she no longer does. It can also be viewed discriminatory.

50. Despite Plaintiff's formal complaint, Defendant Custode's discriminatory conduct continued.

51. For example, on November 17, 2022, Plaintiff confronted Defendant Custode regarding her decision to hire an external candidate rather than promote a qualified African American Associate based on his race.

52. Defendant Custode downplayed Plaintiff's complaint that she was engaged in racial discrimination, stating that the employee will not be aware of the new hires title, and purported to be contemplating a new position for the employee in question.

53. Plaintiff reasonably believed Defendant Custode was using this purported new position as a pretext to cover up the Defendants' discrimination. Plaintiff's belief was correct, as Defendant Custode never created said position.

54. Plaintiff could not continue to sit idly and allow Defendant Custode to violate of the New Jersey Law Against Discrimination. Therefore, on December 16, 2022, with nowhere else to turn, Plaintiff again reported her belief that Defendant Custodes was engaged in racial discrimination to Defendant Sloan and Defendant Wuestenberg. Defendants did not respond to Plaintiff's complaint.

55. On November 30, 2022, Plaintiff reported to Defendant Wuestenberg what she believed was yet another occurrence of racial discrimination by Defendant Custode.

**From:** Lourdes Gonzalez
**Sent:** Wednesday, November 30, 2022 4:31 PM
**To:** Mary Wuestenberg <mwuestenberg@central.com>
**Subject:** FW: LAST WEEK BIN MOVEMENTS REPORT

Hi Mary, I wanted to send you this as well. I mentioned that at one-point Geisi approached me to write up James Funches (African American) for working too slow. I advised her that I was not comfortable writing him up based on her perception and KPI should be implemented for all. This is the process that was put into place. James was termed the next day it was implemented (for other reasons) and she no longer continued with the process, even after it was introduced to the Team Leads. I asked her about it a few times about how the process was going. She never denied that it was not implemented she was just dismissive. I went to speak to the Team Lead Kattia to advise her that it should still be used even if Ramiro was not here, and she said asked me are you sure? I think she went to verify with Geisi and Geisi said not to do it any longer. All I know is that ever since James termination it has not been used.

**Lourdes I. Gonzalez**
**Senior Human Resources Manager**
lgonzalez@centralpet.com
401A Cabot Drive, Hamilton NJ, 08691
O 609-438-3425 M 609-358-3394 CENTRAL.COM

CENTRAL HUMAN RESOURCES

**From:** Lourdes Gonzalez
**Sent:** Wednesday, November 30, 2022 4:45 PM
**To:** Mary Wuestenberg
**Subject:** RE: LAST WEEK BIN MOVEMENTS REPORT

He was terminated for Attendance and Safety violation. I am trying to show the pattern of applying policies or process that would negatively impact African Americans so that she can term them. If she indeed wanted to improve productivity and track performance from the whole group, why not follow the process after James's termination? This process could have provided us with objective productivity data. Attendance policy was only important to enforce when we had a African Americans.

**Lourdes I. Gonzalez**
**Senior Human Resources Manager**
lgonzalez@centralpet.com
401A Cabot Drive, Hamilton NJ, 08691
O 609-438-3425 M 609-358-3394 CENTRAL.COM

CENTRAL HUMAN RESOURCES

56. On November 28, 2022, Defendants initiated an investigation at the Hamilton warehouse into Plaintiff's complaints.

57. During the investigation, Plaintiff reported to Defendant Wuestenberg her belief that Defendant Custode was interfering in the investigation.




58. Thereafter, on January 3, 2023, Defendant Wuestenberg informed Plaintiff that Defendants' investigation was closed.

59. Defendant Wuestenberg informed Plaintiff that the investigation found no such instances of any sort of discrimination occurring at Defendant Central Garden & Pet.

60. On January 5, 2023, Plaintiff reported to Defendant Sloan she believed Defendant Central Pet & Garden had violated FCRA and OCA during the hiring process for an incoming CDL Driver. Plaintiff's report subjected her to a hostile work environment in direct retaliation for lodging her complaints and Plaintiff reported the retaliation to Defendant Sloan.

61. Then, on January 12, 2023, George Yuhas, Legal Counselor at Defendant Central Pet & Garden informed Plaintiff that due to the "lack of trust" between Defendants and Plaintiff, Defendants cannot see how Plaintiff can continue to work at Defendant Central Pet & Garden.

62. Then, Defendants attempted to negotiate a confidential severance agreement that required Plaintiff to waive any wrongful termination claims. The severance negotiations lasted for two and a half weeks. This was an obvious effort to silence Plaintiff.

63. The severance negotiations lasted for two and a half weeks and were ultimately unsuccessful.

64. During the negotiations, Defendants placed Plaintiff on paid leave, effectively suspending her employment. Plaintiff's suspension was in direct retaliation for lodging her complaints of fraud, illegal conduct, and racial discrimination occurring at Defendants.

65. Then, on January 30, 2023, Defendants terminated Plaintiff's employment.

66. Throughout the course of her employment, Plaintiff received multiple forms of retaliation, culminating in her termination, due to her complaints of fraud, wage theft, and racial discrimination in violation of the NJLAD, *N.J.S.A.* 10:5-1, *et seq.*

67. Plaintiff's unlawful termination was nothing more than a retaliatory act for lodging her complaints of serious unlawful conduct occurring at Defendants.

68. Plaintiff's unlawful termination constituted a concerted effort by Defendants to silence her whistleblowing complaints.

69. Defendants terminated Plaintiff in direct retaliation for her whistleblowing complaints and conducted a sham investigation and negative performance reviews to lay the groundwork for Plaintiff's termination.

70. The justification for Defendants baseless termination of Plaintiff were clearly pretexts to cover their retaliation against Plaintiff for lodging her complaints.

71. Defendants' purported rationale for termination highlight the fact Plaintiff suffered an unlawful termination at the hands of Defendants in retaliation for levying her complaints of racial discrimination occurring in violation of the NJLAD.

## COUNT ONE

## RETALIATION IN VIOLATION OF NEW JERSEY CONSCIENTIOUS EMPLOYEE PROTECTION ACT ("CEPA")

72. Plaintiff repeats each and every allegation set forth above as if set forth fully herein at length.

73. CEPA's purpose, as pronounced by the New Jersey Supreme Court, "is to protect and encourage employees to report illegal or unethical workplace activities and to discourage … employers from engaging in such conduct."

74. CEPA specifically provides that:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:
>
> a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or another employer, with whom there is a business relationship, that the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, in the case of an employee who is a licensed or certified health care professional, reasonably believes constitutes improper quality of patient care; or

(2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity;

b. Provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law by the employer, or another employer, with whom there is a business relationship, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, in the case of an employee who is a licensed or certified health care professional, provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into the quality of patient care; or

c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, if the employee is a licensed or certified health care professional, constitutes improper quality of patient care;

(2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity; or

> (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

N.J.S.A. 34:19-3.

75. Throughout the course of her employment, Plaintiff reported and complained of the wage theft and racial discrimination occurring at Defendants in which Plaintiff believed was in violation of the NJLAD.

76. Defendants had direct knowledge of Plaintiff's complaints and/or protests.

77. As a direct result of Plaintiff raising complaints, Defendants took retaliatory action against Plaintiff, culminating in her termination of employment.

78. Defendants are vicariously, strictly, and/or directly liable to Plaintiff for an unsafe and hostile work environment in violation of CEPA, pursuant to N.J.S.A. 34:19-1, et seq.

79. Defendants' explanations for terminating Plaintiff's employment are pretextual.

80. As a proximate result of the aforementioned acts and omissions set forth herein, Plaintiff has sustained damages.

81. CEPA's waiver provision in N.J.S.A. 34:19-8 is inapplicable.

82. Defendants' explanations for terminating Plaintiff's employment are pretextual.

83. Defendants are vicariously, strictly, and/or directly liable to Plaintiff for an unlawful retaliatory discharge in violation of CEPA, pursuant to N.J.S.A. 34:19-1, *et seq*.

84. As a proximate result of the aforementioned acts and omissions set forth herein, Plaintiff has sustained damages.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants on this Count, together with compensatory and equitable relief, all remedies available under CEPA, punitive

damages, pre-and post-judgment interest, attorney's fees and costs of suit, and for such other relief that the Court deems equitable and just.

**COUNT TWO**

**WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY**

85. Plaintiff repeats each and every allegation set forth above as if set forth fully herein at length.

86. During the course of her employment, Plaintiff reported and complained about Defendants' unlawful racial discrimination. Defendants had knowledge of Plaintiff's protests and terminated her as a result thereof.

87. The acts of Defendants constitute a wrongful discharge in violation of public policy by which Plaintiff has been damaged and will continue to suffer damages.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants on this Count, together with compensatory and equitable relief, all remedies available under the law, punitive damages, pre-and post-judgment interest, attorney's fees and costs of suit, and for such other relief that the Court deems equitable and just.

**COUNT THREE**

**NJLAD – HOSTILE WORK ENVIRONMENT—SEXUAL HARASSMENT AND DISCRIMINATION DUE TO GENDER/SEX**

88. Plaintiff repeats each and every allegation set forth above as if set forth fully herein at length.

89. The pattern and practice of hostile work environment sexual harassment and retaliation directed at Plaintiff is outlined above.

90. Plaintiff was subjected to repeated, pervasive, severe, and continuing instances of disparate treatment and sexual harassment based on gender/sex.

91. The above-described conduct would not have occurred but for Plaintiff's gender/sex.

92. The harassing and discriminatory conduct was severe or pervasive enough to make a reasonable person and employee believe that the conditions of employment were altered, and the working environment was hostile and discriminatory.

93. As discussed above, Defendants subjected Plaintiff to repeated and pervasive harassment. After Plaintiff reported the harassment, Defendants subjected Plaintiff to repeated retaliation.

94. It is unlawful discrimination "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so." N.J.S.A. 10:5-12(e). The NJLAD imposes liability to Individual Defendants irrespective of their supervisory role. Cicchetti v. Morris County Sheriff's Office, 194 N.J. 563, 568 (2008) (holding that individual liability is limited to "acts that constitute aiding or abetting," without requiring that the individual also qualify as a supervisor.); Raber v. Express Scripts Hold. Co., No. 18-cv-8639, 2019 U.S. Dist. LEXIS 34444 (D.N.J. Mar. 5, 2019); Stouch & Bodnar v. Dep't of Child Protection and Permanency, et al., Docket No. BUR-L-151-19 (Law Div. May 12, 2020).

95. As discussed above, the Defendants have direct involvement in Plaintiff's discrimination and retaliation. Defendants aided in conduct that caused injury to Plaintiff, Defendants was generally aware of his role in the unlawful conduct, and Corporate Defendants knowingly and substantially assisted in the unlawful conduct.

96. Defendants aided, abetted, incited, compelled and/or coerced, and/or attempted to aid, abet, incite, compel and/or coerce each other and/or Corporate Defendants to commit acts and omissions that were in violation of the NJLAD by committing affirmatively retaliatory acts toward Plaintiffs, rendering them individually and collectively liable to Plaintiff pursuant to N.J.S.A. 10:5-12(e).

97. As a proximate result of the aforementioned acts and omissions set forth herein, Plaintiff has sustained damages.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants on this Count, together with compensatory and equitable relief, all remedies available under NJLAD, punitive damages, pre-and post-judgment interest, attorneys' fees and costs of suit and for such other relief that the Court deems equitable and just. More specifically, Plaintiff demands judgment against Defendants for harm suffered in violation of the NJLAD as follows:

A. Reinstatement of employment and all benefits;
B. Back pay and benefits;
C. Front pay and benefits;
D. Compensatory damages;
E. Consequential damages;
F. Reinstatement;
G. Punitive damages;
H. Prejudgment interest and enhancements to off-set negative tax consequences;
I. Any and all attorneys' fees, expenses and/or costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Plaintiff in the prosecution of this suit (including enhancements thereof required to off-set negative tax consequences and/or enhancements otherwise permitted under law);
J. Such other relief as may be available pursuant to the NJLAD and which the Court deems just and equitable;
K. Ordering Defendants to take appropriate corrective action to stop and prevent retaliation at the workplace;
L. Ordering Defendants to take appropriate corrective action to stop and prevent harassment at the workplace;
M. Ordering Defendants to undergo anti-discrimination training;
N. Ordering Defendants to undergo anti-retaliation training;
O. Ordering Defendants to undergo anti-harassment training;
P. Ordering Defendants to undergo workplace civility training;

Q. Ordering Defendants to undergo bystander intervention training;
R. Ordering Defendants to engage a research organization to assess the effectiveness of their anti-discrimination training;
S. Ordering Defendants to engage a research organization to assess the effectiveness of their anti-retaliation training;
T. Ordering Defendants to engage a research organization to assess the effectiveness of their anti-harassment training;
U. Ordering Defendants to engage a research organization to assess the effectiveness of their workplace civility training;
V. Ordering Defendants to engage a research organization to assess the effectiveness of their bystander intervention training;
W. Ordering Defendants to identify an appropriate professional to investigate any future complaints of discrimination;
X. Ordering Defendants to identify an appropriate professional to investigate any future complaints of harassment;
Y. Ordering Defendants to identify an appropriate professional to investigate any future complaints of retaliation; and
Z. Such other relief as may be available and which the Court deems just and equitable.

## COUNT FOUR

## NJLAD – DISCIRMINATION, HOSTILE WORK ENVIRONMENT, & DISPARATE TREATMENT DUE TO RACE

98. Plaintiff repeats each and every allegation set forth above as if set forth fully herein at length.

99. Plaintiff was subjected to severe, pervasive, and continuing instances of discrimination, disparate treatment, and harassment based on race.

100. The aforementioned conduct would not have occurred but for Plaintiff's race and/or national origin.

101. The harassing and discriminatory conduct was severe or pervasive enough to make a reasonable person and employee believe that the conditions of employment were altered, and the working environment was hostile and discriminatory.

102. Corporate Defendants did not have an effective anti-harassment policy in place, Corporate Defendants have not maintained an anti-harassment policy that is current and effective, and Corporate Defendants' anti-harassment policy existed in name only.

103. Corporate Defendants did not maintain useful formal and informal complaint structures for victims of discrimination, harassment, and retaliation.

104. Corporate Defendants did not properly train its supervisors and/or employees on the subject of discrimination, harassment, and retaliation.

105. Corporate Defendants failed to institute appropriate monitoring mechanisms to check the effectiveness of the policies and complaint structures.

106. Corporate Defendants did not have a commitment from the highest levels of management that harassment will not be tolerated.

107. Defendants at all times relevant hereto, possessed the requisite authority to alter the terms of Plaintiff's employment. Such a position granted Defendants supervisor authority over Plaintiff and enabled them to control Plaintiff's working environment.

108. Defendants abused their authority by ignoring Plaintiff's complaints of racial discrimination and harassment, and, in turn, created a hostile work environment.

109. As a result of the aforementioned discriminatory conduct, Plaintiff experiences ongoing emotional distress and significant economic damages.

110. As the employers and/or supervisors of Plaintiff, Corporate Defendants are vicariously, strictly, and/or directly liable to the Plaintiff pursuant to the NJLAD, *N.J.S.A.* 10:5-1, *et seq.,* in that the affirmative acts of harassment and discrimination committed by Defendant Saul occurred within the scope of her employment; the creation of a hostile work environment was aided by Corporate Defendants in their control of the day-to-day working environment; and/or

Corporate Defendants were deliberately indifferent, reckless, negligent and/or tacitly approved the hostile work environment; and/or Corporate Defendants failed to create and/or have in place well-publicized and enforced anti-harassment policies, effective formal and informal complaint structures, training, and/or monitoring mechanisms for same despite the foreseeability of harassment and discrimination in the workplace; and/or by having actual knowledge of the harassment and discrimination of Plaintiff and failing to promptly and effectively act to stop it.

111. Plaintiff's supervisors, aided, abetted, incited, compelled, and/or coerced, and/or attempted to aid, abet, incite, compel and/or coerce Corporate Defendants to commit acts and omissions that were in violation of the NJLAD by committing affirmatively discriminatory and harassing acts towards Plaintiff in violation of their supervisory duties to halt or prevent harassment, subjecting Corporate Defendants to liability to Plaintiff pursuant to N.J.S.A. 10:5-12(e).

112. As a proximate result of the aforementioned acts and omissions set forth herein, Plaintiff has sustained damages.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Corporate Defendants on this Count, together with compensatory and equitable relief, all remedies available under the law, punitive damages, pre-and post-judgment interest, and attorney's fees and costs of suit. More specifically, Plaintiff demands judgment against Corporate Defendants for harm suffered in violation of the NJLAD as follows:

A. Reinstatement of employment and all benefits;
B. Back pay and benefits;
C. Front pay and benefits;
D. Compensatory damages;
E. Consequential damages;
F. Reinstatement;
G. Punitive damages;
H. Prejudgment interest and enhancements to off-set negative tax consequences;

I. Any and all attorneys' fees, expenses and/or costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Plaintiff in the prosecution of this suit (including enhancements thereof required to off-set negative tax consequences and/or enhancements otherwise permitted under law);

J. Such other relief as may be available pursuant to the LAD and which the Court deems just and equitable;

K. Ordering Defendants to take appropriate corrective action to stop and prevent retaliation at the workplace;

L. Ordering Defendants to take appropriate corrective action to stop and prevent harassment at the workplace;

M. Ordering Defendants to undergo anti-discrimination training;

N. Ordering Defendants to undergo anti-retaliation training;

O. Ordering Defendants to undergo anti-harassment training;

P. Ordering Defendants to undergo workplace civility training;

Q. Ordering Defendants to undergo bystander intervention training;

R. Ordering Defendants to engage a research organization to assess the effectiveness of their anti-discrimination training;

S. Ordering Defendants to engage a research organization to assess the effectiveness of their anti-retaliation training;

T. Ordering Defendants to engage a research organization to assess the effectiveness of their anti-harassment training;

U. Ordering Defendants to engage a research organization to assess the effectiveness of their workplace civility training;

V. Ordering Defendants to engage a research organization to assess the effectiveness of their bystander intervention training;

W. Ordering Defendants to identify an appropriate professional to investigate any future complaints of discrimination;

X. Ordering Defendants to identify an appropriate professional to investigate any future complaints of harassment;

Y. Ordering Defendants to identify an appropriate professional to investigate any future complaints of retaliation; and

Z. Such other relief as may be available and which the Court deems just and equitable.

## COUNT FIVE

## NJLAD – RETALIATION/IMPROPER REPRISAL

113. Plaintiff repeats each and every allegation set forth above as if set forth fully herein at length.

114. Plaintiff complained and/or protested against the continuing course of harassing, discriminatory, and retaliatory conduct set forth at length above. Defendants had knowledge about those complaints and/or protests.

115. The retaliation directed at Plaintiff included but is not limited to, requiring Plaintiff to endure pervasive harassment and discrimination as a condition of employment and failing to investigate Plaintiff's complaints of racial discrimination.

116. Plaintiff was affirmatively terminated by Defendants in retaliation for making complaints about Defendants' conduct and due to Defendants' failure to take corrective and remedial action. As a direct result, Defendants took retaliatory action against Plaintiff, which is outlined above.

117. Defendants are vicariously, strictly and/or directly liable to Plaintiff for unlawful retaliatory conduct in violation of the NJLAD pursuant to N.J.S.A. 10:5-12(d).

118. As a proximate result of the aforementioned acts and omissions set forth herein, Plaintiff has sustained emotional and pecuniary damages.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants on this Count, together with compensatory and equitable relief, all remedies available under the law, punitive damages, pre-and post-judgment interest, attorneys' fees and costs of suit. More specifically, Plaintiff demands judgment against Defendants for harm suffered in violation of the NJLAD as follows:

A. Reinstatement of employment and all benefits;
B. Back pay and benefits;
C. Front pay and benefits;
D. Compensatory damages;
E. Consequential damages;
F. Reinstatement;
G. Punitive damages;
H. Prejudgment interest and enhancements to off-set negative tax consequences;
I. Any and all attorneys' fees, expenses and/or costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Plaintiff in the prosecution of this suit (including enhancements thereof required to off-set negative tax consequences and/or enhancements otherwise permitted under law);
J. Such other relief as may be available pursuant to the NJLAD and which the Court deems just and equitable;

K. Ordering Defendants to take appropriate corrective action to stop and prevent retaliation at the workplace;
L. Ordering Defendants to take appropriate corrective action to stop and prevent harassment at the workplace;
M. Ordering Defendants to undergo anti-discrimination training;
N. Ordering Defendants to undergo anti-retaliation training;
O. Ordering Defendants to undergo anti-harassment training;
P. Ordering Defendants to undergo workplace civility training;
Q. Ordering Defendants to undergo bystander intervention training;
R. Ordering Defendants to engage a research organization to assess the effectiveness of their anti-discrimination training;
S. Ordering Defendants to engage a research organization to assess the effectiveness of their anti-retaliation training;
T. Ordering Defendants to engage a research organization to assess the effectiveness of their anti-harassment training;
U. Ordering Defendants to engage a research organization to assess the effectiveness of their workplace civility training;
V. Ordering Defendants to engage a research organization to assess the effectiveness of their bystander intervention training;
W. Ordering Defendants to identify an appropriate professional to investigate any future complaints of discrimination;
X. Ordering Defendants to identify an appropriate professional to investigate any future complaints of harassment;
Y. Ordering Defendants to identify an appropriate professional to investigate any future complaints of retaliation; and
Z. Such other relief as may be available and which the Court deems just and equitable.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues.

McOMBER, McOMBER, & LUBER, P.C.
*Attorneys for Plaintiff, Lourdes Gonzalez*

By: *<u>/s/ Matthew A. Luber</u>*
Matthew A. Luber, Esq.

Dated: April 10, 2023

## DESIGNATION OF TRIAL COUNSEL

Pursuant to <u>Rule</u> 4:25-4, MATTHEW A. LUBER, ESQUIRE is hereby designated as trial counsel for Plaintiff.

**CERTIFICATION**

Pursuant to Rule 4:5-2, it is hereby certified that, to the best of my knowledge, there are no other civil actions or arbitration proceedings involving this matter with respect to this matter and no other parties need to be joined at this time. I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

McOMBER, McOMBER, & LUBER, P.C.
*Attorneys for Plaintiff, Lourdes Gonzalez*

By: */s/ Matthew A. Luber*
Matthew A. Luber, Esq.

Dated: April 10, 2023

# EXHIBIT B

Jennine DiSomma, Esq. (jdisomma@saiber.com)
Jakob B. Halpern, Esq. (jhalpern@saiber.com)
Vincent C. Cirilli, Esq. (vcirilli@saiber.com)
**SAIBER LLC**
18 Columbia Turnpike, Suite 200
Florham Park, New Jersey 07932-2266
(973) 622-3333
*Attorneys for Defendants*
*Central Garden & Pet Co., Geisi Custode,*
*Erin Sloan, and Mary Wuestenberg*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LOURDES GONZALEZ,<br><br>Plaintiff,<br><br>v.<br><br>CENTRAL GARDEN & PET CO., GEISI CUSTODE, ERIN SLOAN, MARY WUESTENBERG, ABC COMPANIES 1-5 (fictitious names describing presently unidentified business entities), and JOHN DOES 1-5 (fictitious names describing presently unidentified individuals),<br><br>Defendants. | Civil Action No. ______<br><br>**DECLARATION OF GEISI CUSTODE**<br><br>***Document Filed Electronically*** |

**GEISI CUSTODE**, of full age, hereby certifies as follows:

1. I am the Operations Manager at Central Pet Distribution located in Hamilton, New Jersey (the "Hamilton Facility"), and have been named as a defendant in this matter.[1] I am fully familiar with the facts set forth herein and submit this Declaration in support of Defendants' application to remove this case to the United States District Court for the District of New Jersey.

[1] The Complaint incorrectly names me as "Gelsi Custode."

2. It is my understanding that Plaintiff is alleging, in part, that she was terminated in retaliation for having raised certain complaints while employed by Central Garden & Pet Company ("Central").

3. I joined Central in May 2021, and became Operations Manager at the Hamilton Facility in November 2021. At the time I commenced employment at the Hamilton Facility, Plaintiff had already been working in her corporate role as a Senior Human Resources Manager at Central for some time. As the Operations Manager at the Hamilton Facility, I exercised no supervisory authority over Plaintiff. Plaintiff was not in my chain of command, and I was not responsible for managing Plaintiff nor anyone else in Central's human resources department.

4. I had no decision-making authority over Plaintiff and could not hire, terminate, or discipline Plaintiff.

5. Although Plaintiff alleges that "Defendants" attempted to negotiate a confidential severance agreement with her in January 2023, I did not participate in any alleged severance negotiations involving Plaintiff nor was I aware that such negotiations were even taking place in January 2023.

6. Although Plaintiff alleges that "Defendants" placed Plaintiff on paid leave in January 2023, I did not place Plaintiff on paid leave nor did I have the authority to place Plaintiff on paid leave.

7. Although Plaintiff alleges that "Defendants" terminated her employment on January 30, 2023, I did not make the decision to terminate Plaintiff nor did I have the authority to make that decision.

8. Moreover, I was not consulted on the decision to terminate Plaintiff.

9. In fact, I did not learn about Plaintiff's termination until after it had occurred.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

GEISI CUSTODE

Dated: 05/31/2023